IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| TFG-ILLINOIS, L.P., a Utah limited partnership,<br><br>    Plaintiff,<br><br><br><br>        vs.<br><br><br>UNITED MAINTENANCE COMPANY, INC., an Illinois corporation, UNITED SECURITY SERVICES, INC., a Nevada corporation, UNITED SUPPLY SERVICES, INC., a Nevada corporation, UNITED TEMPS, INC., a Nevada corporation, UNITED NATIONAL MAINTENANCE, INC., a Nevada corporation, RICHARD A. SIMON, a citizen of Illinois, and CAROL D. STEIN-STERLING, a citizen of Illinois,<br><br>    Defendants. | MEMORANDUM DECISION AND ORDER ON ALL PENDING MOTIONS<br><br><br><br><br>Case No. 2:09-CV-1122 TS |

This matter is before the Court on several motions: (1) Defendants United Maintenance

Company, Inc., United Security Services, Inc., United Supply Services, Inc., United Temps, Inc.,

United National Maintenance, Inc., Richard A. Simon, and Carol D. Stein Sterling's (collectively

"United") Motion to Dismiss for Lack of Subject-Matter Jurisdiction Pursuant to Rule 12(b)(1)[1]; (2) Plaintiff TFG-Illinois's ("TFG") Motion for Summary Judgment on All Claims[2]; (3) United's Motion for Partial Summary Judgment on the Issue of the Guaranties[3]; (4) United's Motion for Partial Summary Judgment on the Nature of the Lease Agreement[4]; (5) TFG's Motion to Exclude Opinion of Derk G. Rasmussen[5]; (6) TFG's Motion to Strike United's Motion for Partial Summary Judgment on the Nature of the Parties' Agreement and in the alternative Plaintiff's Rule 56(f) Motion for Additional Discovery[6]; and (7) TFG's Motion to Strike Footnote No. 5 to Defendants' Reply in Support of Their Motion to Dismiss.[7]

## I. BACKGROUND

On January 3, 2006, TFG entered into a Master Lease Agreement ("the Lease Agreement" or "the Lease") with United. The subject of the Lease was computer accounting software, hardware, and the consulting services needed to install that software ("the Leased Equipment").[8] The Lease was to consist of three terms: the Delivery Term, the Acceptance Term, and the Base

---

[1]Docket No. 67.

[2]Docket No. 64.

[3]Docket No. 72.

[4]Docket No. 70.

[5]Docket No. 82.

[6]Docket No. 86.

[7]Docket No. 120.

[8]Docket No. 65 Ex. I, at 1.

Term.[9]  The Delivery Term would begin once United took delivery of the Leased Equipment, and would end when the Acceptance Term began.[10]  The Acceptance Term commenced on the Acceptance Date, which was to be the earlier of either "(i) the date as set forth in the Acceptance Certificate, or (ii) if Lessee does not, for any reason, sign an Acceptance Certificate the date shall be the date Lessee received the Equipment."[11]  Under the terms of the Lease, the Base Term was to extend for 36 months and United was to pay $854,285.71 over that time.[12]  At the end of the Base Term, United had three options: (1) purchase the Leased Equipment at a price to be agreed upon; (2) return the Leased Equipment and enter into a new transaction with TFG; or (3) have the Lease renew automatically for another 12 months.[13]  United was required to notify TFG which option United intended to choose by certified mail at least 180 days before the conclusion of the Base Term.[14]  If United failed to do so, or if United and TFG could not reach an agreement on either the purchase terms or the terms for a new agreement when the equipment was returned, the Lease would automatically renew.[15]

---

[9]*Id.* Ex. D ¶ 2(a).

[10]*Id.*

[11]*Id.*

[12]*Id.* Ex. K.

[13]*Id.*  Ex. D ¶ 19(d).

[14]*Id.*

[15]*Id.*

United claims to have received delivery of all equipment before the Lease Agreement was signed.[16]  On March 29, 2006, United signed a Partial Acceptance and Authorization No. 1 for Progress Payments ("the Partial Acceptance").[17]  Then, on October 23, 2006, United signed an Acceptance Certificate to Amended and Restated Lease Schedule No. 1 ("the Final Acceptance").[18]

At the same time United signed the Lease, Richard Simon and Carol Stein-Sterling signed guaranty agreements.[19]  United signed the Lease Schedule No. 1 in conjunction with the Lease Agreement, which contained a provision releasing the guarantors from liability after 18 months of the Base Term, provided there was no ongoing event of default.[20]  Later this schedule was superseded by the Amended and Restated Lease Schedule No. 1, which contained an identical provision.[21]

Before United signed the Final Acceptance in October 2006, United paid roughly $149,000 to TFG.  These payments were classified as pro rata rental payments and were not applied to the Lease balance.[22]  Under the Lease, United was to pay pro rata rental fees to TFG "from the date each Item of Equipment [was] delivered (such delivery to be confirmed by

---

[16]Docket No. 89, lxxii.

[17]Docket No. 65 Ex. G.

[18]*Id.* Ex. I.

[19]*Id.* Ex. BB.

[20]*Id.* Ex. E ¶ 11.

[21]*Id.* Ex. I ¶ 10.

[22]Docket No. 48, at 23.

Lessee) (the 'Partial Acceptance Date') through the Acceptance Date."[23] TFG classified these

payments as rental payments rather than lease payments because it did not think the Acceptance

Date had occurred.[24]

On November 16, 2006, TFG sold all its "right, title and interest in the Property in the

Lease" to Republic Bank ("Republic") via a Sales and Assignment Agreement ("Sales

Agreement").[25] The Sales Agreement gave TFG a "unilateral right to repurchase the stream of

the lease payments and leased assets from [Republic] at their fair market value."[26] The agreement

also appointed TFG as Republic's agent to "perform all [Republic's] obligations under the

Lease" in exchange for $120 dollars a year.[27]

United continued to make lease payments through the Base Term. Midway through the

Lease, United's CFO, Mr. Gerald Tack, left the company and was replaced by Ms. Linda Wolf.

When Ms. Wolf arrived, she tried to inform herself about the Lease, but apparently remained

unaware of the end of term options specified in paragraph 19(d) of the Lease Agreement.[28]

In October 2009, United sent TFG an email asking if United's latest payment on the

Lease (October) was the final payment.[29] TFG responded that the Lease had been extended

---

[23]Docket No. 65 Ex. D ¶ 2(b).

[24]Docket No. 107, at 21.

[25]Docket No. 69 Ex. B, at 1.

[26]*Id.* at 2.

[27]*Id.* at 2.

[28]Docket No. 89 Ex 14, at 84:14.

[29]Docket No. 65 Ex. U (filed under seal).

because TFG had not received written notice of United's end of term election.[30]  Soon after, Ms. Wolf contacted Mr. Johnson at TFG and argued with him about whether the automatic extension was proper.[31]  Mr. Johnson maintained his position that the Lease had been extended, and rejected an offer from Ms. Wolf to purchase the equipment at $25,000.[32]

After disagreeing with Mr. Johnson, Ms. Wolf cancelled the November 2009 lease payment.[33]  United has made no payments since.  During a November 2009 phone call on an unspecified date, TFG claims to have exercised its right to repurchase the lease payments and Leased Equipment from Republic Bank.[34]

TFG filed suit for breach of contract against both United and the guarantors on December 21, 2009,[35] and United answered with counterclaims.[36]  TFG has moved for summary judgment on all claims.  United has moved to dismiss TFG's suit for lack of standing and for summary judgment on two issues.  TFG has responded to United's motions with various motions to strike. Each motion will be dealt with in turn.

---

[30]*Id.*

[31]*Id.* Ex. T, at 65-70.

[32]*Id.* at 70:1-15.

[33]*Id.* at 77:8-23.

[34]Docket No. 78 ¶ 16.

[35]Docket No. 2.

[36]Docket No. 48.

## II. MOTION TO DISMISS

"[T]he party invoking the federal court's jurisdiction bears the burden of proof."[37] Thus it is TFG's obligation as plaintiff to demonstrate that it had standing at the time this action was commenced.[38]

> A Rule 12(b)(1) motion can challenge the substance of a complaint's jurisdictional allegations in spite of its formal sufficiency by relying on affidavits or any other evidence properly before the court. "It then becomes necessary for the party opposing the motion to present affidavits or any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction."[39]

In considering whether jurisdiction exists, the Court must

> accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party. At the same time, it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing. If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed.[40]

To establish standing, a party must show "(1) she has suffered injury in fact (2) there is a causal connection between the injury and the conduct complained of, and (3) it is likely that the injury will be redressed by a favorable decision."[41]  Only the first element is in dispute here.

---

[37] *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).

[38] *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005) ("Standing is determined as of the time the action is brought.").

[39] *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995) (quoting *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989)).

[40] *Warth v. Seldin*, 422 U.S. 490, 501 (1975) (citations omitted).

[41] *United States v. Colo. Supreme Court*, 87 F.3d 1161, 1164 (10th Cir. 1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-61 (1992)).

An injury in fact is "an invasion of a legally protected interest that is concrete, particularized, and actual or imminent, not conjectural or hypothetical."[42]  To have standing, TFG must have sustained such an injury "as of the time the action is brought."[43]  If TFG's repurchase of the Lease from Republic was valid at the time this suit was filed, then any alleged breach of the Lease would clearly constitute direct injury to TFG.  TFG maintains that the repurchase was valid, but United disagrees.  Because the repurchase was agreed to orally, United claims that the assignment was ineffective under Utah's statute of frauds.  United also argues that Republic did not comply with the requirements of the Sales Agreement that governed the repurchase transaction, and thus the assignment was invalid.  Finally, United argues that, even if the assignment was valid, it did not become effective until after TFG had paid Republic for the Lease in full, which did not occur until well after this suit was filed.

In the alternative, if TFG is correct that a servicer of a loan has standing to sue when a loan contract it was servicing is breached, then TFG can show direct injury as a servicer. Accordingly, the Court will consider both whether the transfer of the Lease was valid and if TFG's alleged status as servicer of the loan confers standing.

A.     VALIDITY OF AN ORAL ASSIGNMENT

As a threshold matter, it appears that United is not permitted to raise a statute of frauds challenge to the validity of the repurchase because United was not a party to the contract between TFG and Republic.  The Restatement of Contracts notes: "[statute of frauds] provisions . . . cannot ordinarily be asserted by third persons, including the obligor of an assigned right.

---

[42]*Id.* at 1164-65.

[43]*Nova Health Sys.*, 416 F.3d at 1154.

8

Notwithstanding noncompliance with the Statute, therefore, the assignment is effective against the obligor."[44]  The Restatement bases this assertion on the more general principle that "only a party to a contract or a transferee or successor of a party to the contract can assert that the contract is unenforceable under the Statute of Frauds."[45]

This principle was essentially adopted in Utah in *Garland v. Fleischmann*.[46]  In *Garland*, the Utah Supreme Court considered a creditor's objection to an oral modification of a contract between creditor's debtor and another party.  The creditor sought to invalidate the modification (thereby protecting her interests as creditor) based on the statute of frauds.  The court held that the creditor's argument "must fail because she is not entitled to raise the defense of the statute of frauds . . . .  She was not a party to the contract, nor was she in privity with a party to the contract."[47]  The court went on to quote Professor Williston with approval: "It is the intent and purpose of the Statute of Frauds to give to the party to an oral contract against whom the enforcement of the contract is sought *by the other party* the right to avail himself of the provisions of the Statute as a defense to his liability."[48]  The court also found that this principle was supported in case law.[49]

---

[44]Restatement (Second) of Contracts: Mode of Assignment in General § 324 cmt. b (1981).

[45]*Id.* Effect of Unenforceable Contracts as to Third Parties § 144 (1981).

[46]831 P.2d 107 (Utah 1992).

[47]*Id.* at 109.

[48]*Id.* (quoting 3 Samuel Williston, A Treatise on the Law of Contracts § 530 (3d ed. 1960) (emphasis added)).

[49]*Id.* (collecting cases).

Though United is not a creditor of Republic or TFG, it is also not a party to the contract assigning the Lease from Republic to TFG, nor is United in privity with either in regards to that contract. Thus, even if the statute of frauds were applicable to this assignment, the claim is not United's to raise.

However, even if United were permitted to raise a statute of frauds challenge in this case, it appears that such a challenge would fail. Utah's statute of frauds requires "lease contracts" to be in writing if the total payments under the lease will amount to more than $1000.[50] Because the lease in question is for considerably more than $1000, United contends that if the assignment from Republic to TFG constitutes a lease contract, then the assignment must be memorialized by a writing and signed by Republic.

A lease is defined by the Utah code as "a transfer of the right to possession and use of goods for a term, in return for consideration."[51] A lease contract is "the total legal obligation that results from the lease agreement," and a lease agreement is "the bargain of the lessor and the lessee."[52] Thus, whereas the agreement between United and TFG or Republic is properly characterized as a lease contract—United receiving the right to possess and use software in return for consideration paid to the lessor—the transfer of the rights to receive payment from a lease is not a lease contract itself. TFG received no right to possess and use any goods from Republic when it repurchased the right to receive lease payments. Accordingly, the repurchase transaction is not a lease contract and does not fall under Utah's statute of frauds for leases.

---

[50]Utah Code Ann. § 70A-2a-201(1) (West 2011).

[51]*Id.* § 70A-2a-103(j).

[52]*Id*. § 70A-2a-103(k)(l).

Instead, the transaction is more accurately characterized as an assignment. An assignment "operates to transfer to the assignee all the right, title, or interest of the assignor in the thing assigned."[53] According to the language of the sales agreement, TFG has the right to repurchase (as opposed to lease) from Republic both the leased assets (here the software) and the stream of lease payments from United. Once the assignment was made, TFG owned all of Republic's right, title and interest in the thing assigned. Neither Utah's specific provisions on leases[54] nor assignments[55] require that an assignment of lease payments be in writing.

"As a general rule, in the absence of a statute to the contrary, any valid right . . . may be assigned orally regardless of whether it is evidenced by a writing."[56] Though case law on the validity of oral assignments in Utah is scant, some cases have addressed the issue. In *Merchants' Credit Bureau v. Robinson*, which considered the assignment of an account for collection, the Supreme Court of Utah noted that "[a]n assignment may be made by parol."[57] In *Lone Mountain Production Co. v. Natural Gas Pipeline Co. of America*, this Court, applying Utah law, reiterated

---

[53]6A C.J.S. *Assignments* § 87 (2011); *accord* Restatement (First) of Contracts: Oral and Written Assignments § 157 (1932) ("A right can be effectively assigned either orally or by a writing.").

[54]*See* Utah Code Ann. § 70A-2a-201.

[55]*Id.* § 70A-2-210.

[56]6A C.J.S. *Assignments* § 64 (2011).

[57]251 P. 10, 10 (Utah 1926).

that "no particular form is necessary to effect a valid assignment."[58]  Thus, if TFG has shown that

an assignment did occur, the fact that it was made orally will not prevent it from being effective.

TFG has put forward evidence tending to show that an oral assignment took place.

Jordan Greenwell, a TFG employee, reported in a sworn declaration that he contacted Republic's

Chief Credit Officer, Mark Carpenter, in November and notified Mr. Carpenter that TFG would

be exercising its unilateral right to repurchase the Lease.[59]  Mr. Carpenter, also in a sworn

declaration, indicates that he received Mr. Greenwell's call and agreed to sell back the Lease.[60]

TFG has also provided financial records showing seven payments of $25,748.17 to Republic as

consideration for the sale of the Lease.[61]  These payments are recorded on the financial records

documenting payments from United to Republic, indicating that the payments from TFG were

meant as consideration for the Lease.  TFG has also submitted emails indicating payments were

made from TFG to Republic.[62]  In short, it appears clear that Republic intended to assign the

Lease to TFG and that TFG intended to receive that assignment in exchange for payments

totaling $180,237.29.  The fact that the parties expressed their intentions orally rather than in a

writing does not make the transaction invalid.

---

[58]710 F. Supp. 305, 309 (D. Utah 1989) (citing *Commodore v. Armour & Co.*, 441 P.2d 815 (Kan. 1968)).  In *Lone Mountain Prod.*, a written assignment was at issue.

[59]Docket No. 78 Ex. A §§ 15-17.

[60]*Id.* at Ex. B §§ 5-7.

[61]Docket No. 104 Ex. B, at 8.

[62]Docket No. 79 Exs. D & E (filed under seal).

United has produced some cases, none from this jurisdiction, that adopt the principle that assignments of leases cannot be oral. United's first case, *Garr v. Winn*, comes from Oklahoma.[63] In that case, the Supreme Court of Oklahoma noted that when a lease was required to be in writing under the state statute of frauds, any assignment of that lease was also required to be in writing.[64] This principle was established by a long line of Oklahoma case law.[65] However, Oklahoma law is not binding on this Court, and is especially irrelevant given that it contradicts Utah case law. The same must be said for United's other citations.[66]

B.      REQUIREMENTS OF THE SALES AGREEMENT

United also argues that TFG did not comply with the terms of the Sales Agreement in repurchasing the Lease, and thus contends the transaction either didn't occur or was invalid.

United's first argument is that, based on the Sales Agreement between TFG and Republic, Republic was required to produce a bill of sale if TFG did repurchase the Lease and that Republic did not produce one. To make this argument, United has essentially poached an unrelated requirement from a preceding paragraph in the Sales Agreement, which requires

---

[63]272 P.2d 408 (Okla. 1954).

[64]*Id.* at 5 (citing *Woodworth v. Franklin*, 204 P. 452 (Okla. 1921)).

[65]*Woodworth*, 204 P. at 458 (collecting cases).

[66]Plaintiff cites *C&H P'ship v. Shaw Indus. Group*, 2006 WL 1229001 (M.D.N.C. May 4, 2006) and *Diers, Inc. v. Whited*, 2001 WL 708914 (Neb. Ct. App. June 26, 2011). *C&H P'ship* comes from North Carolina, where it has "long been the law . . . that assignments of leases fall under the statue of frauds." 2006 WL 1229001, at *3. *Diers*, an unpublished decision from a Nebraska state court, concerned the sale of goods, a situation clearly addressed by Nebraska statutory law, and thus is entirely irrelevant here.

13

Republic to give TFG a bill of sale, and introduced it into the clause governing TFG's right to repurchase. The preceding paragraph reads:

> Upon Bank's *receipt of all Assigned Rental Payments*, all of Bank's right, title and interest in the Property and Lease shall automatically transfer to [TFG] for no additional consideration, free and clear of all liens, claims and encumbrances caused or permitted by or through Bank, whereupon Bank agrees to deliver to Seller a bill of sale for the Property and the Lease and reassign to Seller any Lessor/Lessee financing statements earlier assigned to Bank in connection with the lease.[67]

This section contemplates the roles of both TFG and Republic after the Lease has come to an end and all payments have been made. When that occurs, title is automatically returned to TFG and Republic is to give TFG a bill of sale. This paragraph is separate, however, from the paragraph governing TFG's right to repurchase the Lease at any time. Though one precedes the other, they contemplate two different situations: the natural conclusion of the Lease period and the right of TFG to repurchase the Lease at any time before that conclusion. The repurchase paragraph reads:

> The parties to this Agreement hereby agree that *during the entire period of time for which Bank will receive lease payments* under the term of this Agreement, [TFG] will have a unilateral right to repurchase the stream of lease payments and leased assets from Bank at their fair market value. The parties agree that fair market value will be defined as the net book value of the lease on Bank's records of accounting at the time a unilateral demand to repurchase is made.[68]

It is clear from this language of the contract that Republic is under no obligation to give TFG a bill of sale in connection with a repurchase occurring before the end of the Lease. Thus, United's argument that the repurchase was invalid because no bill of sale was produced fails.

---

[67]Docket No. 69 Ex. B, at 3 (emphasis added).

[68]*Id.* (emphasis added).

The same must be said of United's contention that TFG's position on whether a bill of sale was required in a repurchase transaction contradicts Republic's interpretation of the contract, which, according to United, "is controlling since Republic actually held the lease at the time."[69] United claims that Boyd Lindquist, the president of Republic, stated in his deposition that a bill of sale was required to effectuate TFG's repurchase.[70] Even if Mr. Lindquist's interpretation were controlling, United has misrepresented his testimony. Focusing on one statement and disregarding its context, United quotes Mr. Lindquist as saying "the document says we would give a bill of sale back. That's typically what we would do."[71] When the context of the statement is explored, however, it becomes clear that Mr. Lindquist was responding to questions relating to the paragraph setting out the end of lease procedures:

> Q: But in terms of the *automatic transfer back to the seller*, the condition in this statement is that the bank must first receive all of the assigned rental payments as that term is defined in this document, correct?
> . . . .
> Q: And then the last clause of that sentence says, "whereupon the bank agrees to deliver to seller a bill of sale for the property and the lease and reassign to seller any lessor/lessee financing statements assigned to bank in connection with the lease." Do you see that statement?
> A: Yes.
> Q: My question to you is has the bank ever delivered a bill of sale for the property and the lease in this particular case?
> A: I don't know.
> Q: If that document existed, would it have been among the documents that you would have produced in connection with the subpoena?

---

[69]Docket No. 113, at 6.

[70]*Id.*

[71]*Id.*

A: Well we provided everything we had.  All I can say is that the document says we would give a bill of sale back.  That's typically what we would do.[72]

Mr. Lindquist was explicitly restricting his testimony to what the Sales Agreement itself said (as opposed to an opinion about what it meant), and was responding to a line of questioning addressing the automatic transfer, not the repurchase provision.  Accordingly, his testimony does not support United's claim.

Finally, United highlights the difference between the words describing what TFG receives from Republic during an automatic reversion and a repurchase situation.[73]  When the Lease automatically reverts at the end of the Lease term, United notes, the language of the agreement specifies that TFG receives all of Republic's "'right, title and interest in the Property and [the Lease].'"[74]  In contrast, when TFG exercises its repurchase option, TFG receives only the "'stream of the lease payments and leased assets from Bank.[75]'" Citing the well established principle of interpretation that when different words are used different meanings are intended, United argues that the differences here are meaningful.[76]  Essentially, United proposes that in a repurchase situation, TFG gets some rights but "not the lease itself."[77]

---

[72]Docket No. 69 Ex. 5, at 111:5-112:5 (emphasis added).

[73]Docket No. 113, at 6 n.3.

[74]*Id*. (quoting Docket No. 69 Ex. B, at 2).

[75]*Id.*

[76]*Id.*

[77]*Id.*

However, regardless of whether United is correct that some unidentified remainder of the Lease stayed with Republic after the assignment, United is not correct that such a situation would destroy TFG's standing, as United is presumably implying in this argument. As an assignee of a right to collect payments on a lease, TFG would clearly be injured by a breach of that lease, even if it did not own the Lease in its entirety.[78] Thus United's contention is irrelevant.

## C.     EFFECTIVE DATE OF ASSIGNMENT

The next issue the Court must resolve is when the assignment became effective. TFG argues that the assignment was made during the November 2009 phone call. United contends that even if an assignment transaction was initiated then, it was not effective until TFG completed its payments to Republic in August of 2010.

Generally, "[o]nce a valid assignment is made, the assignee stands in the shoes of the assignor."[79] Thus, when addressing the question of standing, the relevant point in time is when the assignment was *made*, not necessarily when it was paid off. An assignment is made when the transferor "confers a complete and present right on the transferee. The assignor must not retain control over the property assigned, the authority to collect, or the power to revoke."[80] Thus, the

_____

[78]An assignor can assign "any valid right." 6A C.J.S. *Assignments* § 64. "A valid assignment generally operates to vest in the assignee the same right, title, or interest the assignor has in the thing assigned." *Id.* § 87. Thus, even if the only "thing" Republic was assigning was the right to collect lease payments (as opposed to the Lease itself), as long as the right was valid and the assignment effective, TFG "stands in the shoes of the assignor." *Lone Mountain Prod.*, 710 F. Supp. at 309. Standing in the shoes of Republic as to the right to collect payments, TFG would have constitutional standing to sue any party who purportedly injured that right, just as Republic would.

[79]*Lone Mountain Prod.*, 710 F. Supp. at 309.

[80]*Purco Fleet Servs., Inc. v. Idaho State Dep't. of Fin.,* 90 P.3d 346, 351 (Idaho 2004) (quoting 6 Am. Jur. 2d *Assignments* § 98)).

17

pertinent question here is whether Republic intended to retain any of the rights subject to the assignment until the assignment was paid off.

As has been discussed above, what TFG was seeking to repurchase were the rights to the "stream of lease payments" and the "leased assets."[81]  According to TFG, the repurchase was "an effort to realize the residual economic value in the end-of-term options contained in the lease."[82] Essentially, TFG seems to have been paying Republic for the value of the payments that TFG thought United was obligated to make on the Lease beyond the Base Term.  Accordingly, it seems unlikely that either party intended the effective date of the assignment to be delayed.  After the repurchase agreement was made, TFG began to pay Republic the same monthly payment United had been paying.[83]  It seems reasonable that from the time the agreement was made, TFG (as opposed to Republic) was entitled to any lease payments that United made.  If Republic were to retain the right to payments from United while simultaneously receiving payments from TFG the arrangement would make little sense.

United offers *Thinking Machines Corp. v. Board of Trustees of the University of Illinois*, an unpublished case from the Court of Claims of Illinois, to support its proposition that the assignment was not effective until all payments were made.[84]  The Court notes that this case is not binding authority and, at any rate, is clearly distinguishable.

---

[81]Docket No. 69 Ex. B ¶ 3.

[82]Docket No. 78 Ex. A ¶ 19.

[83]Docket No. 104 Ex. B.

[84]1998 WL 1758269 (Ill. Ct. Cl. Sept. 28, 1998).

In *Thinking Machines*, as in the instant case, plaintiff had entered into a lease with defendant, assigned its interests in the lease to a third party bank by a written instrument, and then claimed to have recovered that interest by means of an oral assignment from the bank.[85] The defendant challenged the plaintiff's standing. The court considered whether the alleged assignment was effective as of the date the suit was commenced, which the court noted was a matter of the parties' intent. Because there was no writing to scrutinize, the court looked to "the surrounding circumstance and acts of the parties to ascertain their intentions."[86] Plaintiff offered a letter drafted by its counsel and acknowledged by the bank as proof of the party's intent. In that letter, the bank noted that it had incurred attorney's fees in relation to the lease during the years previous to the reassignment of the lease back to plaintiff.[87] The letter also acknowledged that the lessee had paid the bank the final amount owing on the lease before the commencement of the suit, and at the time of payment "except for the attorney's fees and costs . . . [the bank's] interest in the Assignment terminated."[88] Unfortunately for plaintiff, however, the letter also contained a statement that after plaintiff paid the bank for the attorney's fees incurred, a transaction that took place after the filing of the suit, the bank "terminated its security interest" in the leased equipment and that "effective with the termination of the security interest . . . [the bank] possesses no right, title or interest, either legal or equitable, in the [Lease] Agreement."[89]

---

[85]*Id.* at *1-2.

[86]*Id.* at *3.

[87]*Id.*

[88]*Id.* at *4.

[89]*Id.*

The court concluded that because this complete termination of interest in the agreement did not occur until after the plaintiff filed suit, plaintiff was not an assignee at the time suit was brought, and accordingly had no standing.[90]

The case before the Court is distinguishable. Plaintiffs in *Thinking Machines* were not intending to "repurchase" the lease from bank. Instead, plaintiff was trying to get back title to the assets after the lease had concluded. However, the bank was apparently unwilling to relinquish all claim on the title until the money it had spent on attorney's fees was reimbursed. The court's focus was not, as United suggests, on the day the amount owed between plaintiff and the bank was paid. Rather, it was on the point at which the bank no longer had any interest in the leased equipment. Conversely, in the case before this Court, TFG has allegedly sought to repurchase a lease that was still active. The distinction is relevant because, as discussed above, the exchange of money indicates TFG's present desire to obtain rights to the lease payments immediately. Regardless of whether Republic might have intended to retain an interest in the *Leased Equipment* until the balance of the Lease was paid off, it would make no sense for Republic to retain an interest in the *lease payments* from United while simultaneously taking money from TFG as compensation for the sale of those payments. Accordingly, Republic makes no claim, as the third party bank in *Thinking Machines* did, that it retained any interest in the lease payments.

At oral argument, United's counsel again referenced a portion of Mr. Lindquist's deposition, which United claims establishes that it was not Republic's intent to transfer the Lease back to TFG until TFG had paid for it. The relevant portion of the deposition reads: "What I say to you is you look at the documents, the sales and assignment. That equipment is transferred to

---

[90]*Id.* at *4-5.

Republic Bank.  When it's paid off, we return it back.  And that's – I think that's clear in the documentation."[91]  The preceding page of the deposition is not included in United's exhibit, rendering it somewhat unclear what the line of questioning is focusing on.  However, it appears that once again Mr. Lindquist is referring to the automatic re-transfer provision rather than the repurchase provision.  It is not clear, at any rate, in the documentation that Republic would have only given the lease rights back to TFG after TFG had paid the full repurchase price.  It is clear, on the other hand, that the documentation requires the Lease to be fully paid off before the Leased Equipment is automatically re-transferred to TFG.

D.     LOAN SERVICER STANDING

TFG contends that even if it was not properly in possession of the Lease at the time this suit was filed, TFG still has standing to sue for breach of contract based on its role as servicer of the Lease.  Under the terms of the Sales Agreement, TFG is designated as

> [Republic's] agent to perform all of [Republic's] obligations as successor lessor under the Lease, including without limitation, billing all rental payments and applicable sales/use tax and property tax, and filing all sales/use and property tax returns and remitting the tax due thereon to the applicable taxing authority.  .  .  . In consideration of [TFG's] performance of the foregoing services, [Republic] shall pay to [TFG] a fee of $10.00 per month, payable each year in advance, on the commencement or anniversary date of this Agreement.[92]

TFG reasons that it was entitled to fees as a servicer of the contract, which fees were lost to it upon United's breach, and thus TFG has been harmed.[93]  TFG cites some case law supporting this proposition, all of which comes from bankruptcy proceedings and relates to the right of a

---

[91]Docket No. 69 Ex. D, at 141:20-25.

[92]*Id.* Ex. B, at 2.

[93]Docket No. 78, at 13.

mortgage servicer to sue in its own name based on its pecuniary interest in continuing to service a defaulted loan.[94]

United responds that TFG is not a mortgage servicer, and that even if it were, the cases TFG cites set forth two requirements for mortgage servicer standing: "(1) the servicer held a 'pecuniary interest in collecting payments under the terms of the note and mortgage,' and (2) the servicer has actual 'possession of the promissory note.'"[95]  Because, according to United, TFG neither collected payments nor held the lease documents, TFG cannot qualify for servicer standing as set forth in these cases.

The test United gleans from the cases cited by TFG is somewhat inaccurate.  Neither case requires that both factors be present in order for a servicer to have standing.[96]  Furthermore, servicer standing has been granted beyond the context of bankruptcy proceedings and does not seem to require anything more than that a servicer have a pecuniary interest that is harmed by a borrower's default.  In *CW Capital Asset Management, LLC. v. Chicago Properties, LLC.*, the Seventh Circuit had "no doubt about the Article III standing" of a mortgage servicer: "though the [servicer] may not be an assignee, it has a personal stake in the outcome of the lawsuit because it

---

[94]*Id.* at 12-14 (citing *In Re O'Kelley*, 420 B.R. 18, 23 (Bankr. D. Haw. 2009); *In re Eads*, 417 B.R. 728 (Bankr. E.D. Tex 2009); *In re Kang Jin Hwang*, 396 B.R. 757 (Bankr. C.D. Cal. 2008).

[95]Docket No. 113, at 8.

[96]*E.g.*, *In Re O'Kelley*, 420 B.R. 18, 23 (D. Haw. 2009) ("Courts have found that 'a mortgage servicer has standing to participate in a debtor's bankruptcy case by virtue of its pecuniary interests . . . .  Courts have also found that a servicer's possession of the note (as opposed to being its legal 'holder') is sufficient to establish standing.") (citations omitted); *In re Eads*, 417 B.R. at 739 n.12 ("Many courts have held that a mortgage servicer has standing to participate in a debtor's bankruptcy case by virtue of its pecuniary interest in collecting payments under the terms of the note and mortgage.") (collecting cases).

receives a percentage of the proceeds of a defaulted loan that it services."[97]   Though a mortgage

servicer is not a lease servicer, the difference does not seem to be relevant for purposes of

determining standing.[98]   The key inquiry is whether TFG as servicer of the loan can be said to

suffer a direct injury from United's alleged breach.   Because TFG, like a mortgage servicer, has a

pecuniary interest in performing its duties, any default by United threatens pecuniary loss.

Though the loss is admittedly much smaller than that which could be sustained by the lessor, the

size of the injury is not at issue.   As TFG notes, the injury requirement is satisfied so long as a

party shows an "identifiable trifle" of injury.[99]   Thus, as long as TFG had a pecuniary interest in

performing its role as servicer of the Lease, a default on the Lease harms that interest and

constitutes an injury in fact.

United has contended that TFG does not actually collect the rent from United on behalf of

Republic.[100]   But how TFG has performed its duties under the Sales Agreement does not affect

the standing inquiry.   What matters is whether TFG had a pecuniary interest in servicing the

Lease.   Under the Sales Agreement, TFG was entitled to receive compensation for its role as

---

[97]610 F.3d 497, 501 (7th Cir. 2010).

[98]*See id.* at 500 (explaining that "every mortgage needs someone to collect the borrower's monthly payments of principal and interest; make sure the property is properly insured; attend to any default, either by suing the borrower and if necessary foreclosing the mortgage or by modifying the mortgage to make its terms less onerous to the borrower; and discharge the mortgage when it is paid off.").   These ministerial duties seem largely analogous to those belonging to TFG pursuant to the Sales Agreement.

[99]Docket No. 78, at 12 (citing *Otero v. Mesa Cnty. Valley Sch. Dist. No. 51*, 568 F.2d 1312, 1314 (10th Cir. 1977)).

[100]Docket 113, at 8.

servicer.  Whether it performed that role well has no bearing on whether or not TFG suffered injury attributable to United's alleged breach of the Lease.

E.     CONCLUSION

The Court finds that TFG has standing to bring this action because the assignment between TFG and Republic was valid.  Furthermore, even if there were some statute of frauds deficiency in the assignment, United, as a third party obligor, would not have standing to challenge that deficiency.  Finally, even if the assignment was invalid, TFG would have standing as a servicer of the Lease.  Accordingly, the Court will deny the Motion to Dismiss.

## III. TFG'S MOTION FOR SUMMARY JUDGMENT

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.[101]  The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact.[102]  "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial."[103]  "An issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[104]

TFG moves for summary judgment on all its claims, as well as United's counterclaims. TFG alleges breach of contract against United and United's guarantors Richard A. Simons and

---

[101] *See* Fed.R.Civ.P. 56(a).

[102] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[103] *Sally Beauty Co., Inc., v. Beautyco, Inc.*, 304 F.3d 964, 971 (10th Cir. 2002).

[104] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Carol D. Stein-Sterling. TFG contends that United breached in three ways: (1) by failing to pay the amount owing under the Lease during the extension period, which United automatically entered into by failing to provide notice of its end of term election, (2) by failing to pay for the month of November, 2009, which was purportedly the last payment owed on the Base Term, and (3) by failing to notify TFG of deficiencies in the Leased Equipment and actions that United took in response to those deficiencies. United responds that, though it did not provide notice by certified mail, it did provide TFG with oral notice that United would be purchasing the Leased Equipment, which TFG subsequently acknowledged via email. United also claims that Plaintiff committed fraud and that this was a breach on TFG's part excusing all further performance from United. Finally, United argues that under the terms of the Lease Agreement, United was not required to inform TFG of flaws in the software.

United counterclaims with four causes of action: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) unjust enrichment; and (4) fraud in the inducement.

A.    EXTENSION TERM PAYMENTS

TFG's first breach claim focuses on the end of term options found in section 19(d) of the Lease Agreement. TFG contends that 19(d) allows TFG to extend the Lease, that TFG did so in accordance with 19(d), and that United breached the contract by refusing to pay lease payments for the extension term. Section 19(d) reads:

> (i) purchase all, but not less than all, of the Items of Equipment for a price to be agreed upon by both [TFG] and any applicable Assignee and [United], (ii) extend the Lease for twelve (12) additional months at the rate specified on the respective Schedule, or (iii) return the Equipment to [TFG] . . . . In the event Lessor and Lessee have not agreed to either option (i) or (iii) by the end of the Base Term or

if Lessee fails to give written notice of its election vias certified mail at least one hundred eighty (180) days prior to the termination of the Base Term, then option (ii) shall apply at the end of the Base Term.[105]

"Where [contract] language is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language."[106] The Court finds that section 19(d) is not ambiguous and that it clearly states that if United failed to elect an option within 180 days of the end of the Lease by certified mail the Lease would be automatically extended. The Court also finds that United did not comply with the contractual requirements for exercising the option to purchase the Leased Equipment. United admits as much, but contends that because there is proof that TFG knew that United wanted to buy the Leased Equipment, and that TFG knew this long before the 180 day cut off, the Court should apply the doctrine of substantial compliance and hold that the notice requirement of 19(d) was satisfied.

In response, the Court notes that both TFG and United are sophisticated parties well versed in the vicissitudes of contractual obligations. Furthermore, United was assisted by counsel throughout the bargaining process. "Freedom of contract prevails in an arm's length transaction between sophisticated parties such as these, and in the absence of countervailing public policy concerns there is no reason to relieve them of the consequences of their bargain. If they are dissatisfied with the consequences of their agreement, the time to say so was at the bargaining table."[107] Despite the unambiguous language of 19(d) and the sophistication of the

---

[105]Docket No. 65 Ex. D ¶ 19(d).

[106]*Glenn v. Reese*, 225 P.3d 185, 188-89 (Utah 2009) (internal quotation marks and citation omitted).

[107]*Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415, 421 (N.Y. 1995) (internal quotation marks and citation omitted).

contracting parties, United asks the Court to excuse United's failure to send notice by applying the doctrine of substantial performance.

"[S]ubstantial performance is an equitable doctrine which should be sparingly employed as it defeats the bargained-for legal rights of the parties."[108] United's only evidence suggesting it provided notice to TFG of its election is (1) an email written by Mr. Dave Johnson of TFG that was forwarded by Mr. Wes Hales, also of TFG, to Mr. Gerald Tack, United's CFO ("2006 Email")[109]; and (2) two email chains between Mr. Mark Jackson of United and Mr. Johnson in 2008 and 2009 ("the Jackson-Johnson Emails").[110]

Apparently in response to requests from Mr. Tack to make alterations to the lease documents, Mr. Johnson informed Mr. Tack in the 2006 Email that TFG could not eliminate a certain section from the Lease Agreement. After explaining why, Mr. Johnson wrote: "keep in mind that this paragraph only applies if equipment is returned–you will be purchasing the equipment so it is really a non-issue."[111] At best, the 2006 Email shows that at some time during negotiations, someone from United told someone from TFG that United wanted to purchase the equipment. Furthermore, the 2006 Email itself shows that, at the time it was written, United and TFG were still dickering over Lease terms. An oral expression of desire to purchase that is only documented by inference and communicated before the Lease was finalized by some unknown person is simply not substantial enough to be substantial performance.

---

[108]*Cache Cnty. v. Beus*, 978 P.2d 1043, 1050 (Utah Ct. App. 1999).

[109]Docket No. 64 Ex. 5.

[110]Docket No. 89 Exs. 16 & 17.

[111]Docket No. 64 Ex. 5.

Nor can the Jackson-Johnson Emails be seen as an election without an excess of creativity. In the first chain, Mr. Jackson asks for a statement showing the "buyout cost of the [remainder] of the lease."[112] This language is certainly not a clear indication of United's intentions. If anything, it shows that United was simply looking for more information. Furthermore, Mr. Jackson asks in the same email whether United could extend the Lease in order to lower its payments. This is confusing notice at best, and the uncertainty it creates speaks to why TFG may have bargained for a formal notice process in the first place.

The second email chain is even less clear. In it, Mr. Jackson simply asks to know the balance because "auditors are here and they need to know."[113] Perhaps if there was evidence that United had expressed in some official, authoritative way an unequivocal desire to purchase the equipment at the end of the Base Term the Court would be able to find that a failure to use certified mail was not fatal. But where United has done very little to communicate its election to TFG, and what little it has done is ambiguous at best, the performance cannot be said to be substantial. Granting United's request based on so little performance could hardly be characterized as applying the doctrine of substantial performance "sparingly."

Based on the foregoing, the Court finds that United cannot be excused from its failure to provide notice by certified mail to TFG by application of the doctrine of substantial performance. It follows that, based on the undisputed facts, United is responsible for the extension term payments and has breached the Lease by failing to make them.

---

[112]Docket No. 89 Ex. 16.

[113]*Id.* Ex. 17.

## B. THE NOVEMBER PAYMENT

It is undisputed that United did not remit the November 2009 payment.[114] TFG contends that this failure to pay is a clear breach of the Lease Agreement. United claims that this was not a violation of the Lease Agreement because TFG "first breached the lease agreement and its covenant of good faith and fair dealing by taking the position that United had not made an election to purchase the equipment at the end of the base term of the lease and that the lease had automatically extended."[115]

As set forth above, the Court finds that TFG's extension of the Lease was valid. It follows that United's failure to pay the November 2009 payment is without excuse. Accordingly, summary judgment is granted for TFG on the November payment.

## C. FAILURE TO NOTIFY AND ABANDONMENT

TFG has also claimed breach based on (1) United's failure to notify TFG of problems with implementation of the software; and (2) United's abandonment of the Leased Equipment. There is no dispute that the software did not work the way United wanted it to. It is also undisputed that United reached a settlement agreement with the software company and the implementation consultants on September 24, 2007, concerning the failure of the Leased Equipment.[116] After that settlement was reached, the Leased Equipment was apparently

---

[114]*See* Docket No. 65 Ex. X (letter from United's counsel informing TFG that he is "prepared to authorize United to release the final payment provided TFG's unreasonable claim that the Lease was renewed is cancelled. United has fully paid all obligations under the Lease except for the one month payment").

[115]Docket No. 89, at lvii.

[116]Docket No. 66 Ex. Y.

abandoned such that United did not have any of it when United cancelled its November 2009 payment.[117]

The Court notes that TFG has provided no evidence of damages stemming from United's failure to communicate issues with the software, and therefore the Court will not grant summary judgment on that claim.

The Lease Agreement required United to "at all times keep the Equipment in its sole possession and control."[118] Accordingly, TFG argues that United breached the Lease Agreement by abandoning the Leased Equipment. United responds that this provision is superseded by paragraphs 6(f) and 6(g), which "cover the same subject matter but which are specific to leases involving software."[119] Thus, United asks the Court to apply the rule of interpretation that "'if [there is an] apparent inconsistency . . . between a clause that is general and broadly inclusive in character and one that is more limited and specific in its coverage, the latter should generally be held to operate as a modification and pro tanto nullification of the former.'"[120] TFG responds that 6(f) and 6(g) are not inconsistent with 6(b) and that, accordingly, the Court need not elevate the specific provisions over the general.

To the extent United is arguing that all provisions governing the use of "Equipment" in the Lease are superseded by the provisions governing use of the software, the Court disagrees.

---

[117]*Id.* Ex. V ("[T]here is no equipment, software or other lease assets in the possession of United Maintenance.").

[118]Docket No. 65 Ex. D ¶ 6(b).

[119]Docket No. 89, at xxxii.

[120]*Id.* (quoting 3 Arthur L. Corbin, Corbin on Contracts § 547, at 176 (1960)).

The Lease specifically defines "Equipment" to include software.[121]  Thus, the parts of the Lease

applicable to "Equipment," such as 6(b), are equally applicable to software.  While it may be

correct that specific provisions supersede general provisions when they are in tension with each

other,[122] the Court sees nothing in either 6(f) or 6(g) that conflicts with the language in 6(b)

requiring United to "keep the Equipment in its sole possession and control."  Accordingly, there

is no reason for the Court to ignore 6(b) in the context of software.

 The Court notes that because United no longer has the Leased Equipment, TFG is

damaged by the abandonment of the Leased Equipment to the extent that it had any value at the

end of the extension period.  This value depends on what United and TFG's rights and

responsibilities were with respect to the Leased Equipment at the end of the extension term.

 In contrast to the provision governing the conclusion of the Base Term, Section 19(d) of

the Lease Agreement does not specify what is to happen to the Leased Equipment at the

conclusion of the extension period.  However, sections (6)(e) and (g) spell out the procedure to

be followed upon conclusion of the Lease generally.  Section 6(e) applies to all Leased

Equipment, and 6(g) applies specifically to software.  The Leased Equipment was comprised of

both software and hardware.[123]

---

[121]Docket No. 65 Ex. D ¶ 6(f).

[122]*Cogswell v. Merrill Lynch*, 78 F.3d 474, 480 (10th Cir. 1996).

[123]Docket No. 89 Ex. 9, at 3.

Section 6(e) requires United to "at the termination of the Lease . . . de-install, pack and return the Equipment to [TFG]."[124] Because United no longer has the hardware,[125] TFG is entitled to the value of that hardware at the end of the extension period.

Section 6(g) requires that

> at the expiration . . . of [the] Lease, [United] shall (i) delete from its systems all Software then installed; (ii) destroy all copies or duplicates of the Software which were not returned to [TFG]; and (iii) cease using the Software altogether. Upon its receipt from [United], [TFG] shall be responsible to destroy the Software or render it unusable, or to return the Software to the owner/vendor/licensor . . . .[126]

Though TFG would likely also have been able to attempt to sell the software to United at end of the extension term if it had not been abandoned, it is clear that United would not have bought it. Thus, even if the software had not been abandoned, TFG would have received no value from it at the end of the extension period. This loss of value is attributable to the failure of the software to work as planned, not to United's subsequent abandonment of the software. Accordingly, TFG's damages for the abandonment of equipment are limited to the value of any hardware as of the time the Lease ended.

D.    DAMAGES

Since damages may be proved, the Court will grant TFG's Motion for Summary Judgment and allow the finder of fact to determine the amount of damages at trial.

---

[124]Docket No. 65 Ex. D.

[125]*Id.* Ex. V ("[T]here is no equipment, software or other lease assets in the possession of United Maintenance.").

[126]*Id*. Ex. D.

E.      UNITED'S COUNTERCLAIMS

United makes four counterclaims: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) unjust enrichment; and (4) fraud in the inducement.

1. BREACH OF CONTRACT

United contends that TFG breached the Lease Agreement by (1) refusing to permit United to purchase the Leased Equipment at the end of the lease term; (2) by extending the lease term; and (3) by classifying United's payments from March to October 2006 as rental payments rather than lease payments.[127]  As noted above, the Court is persuaded that TFG complied with section 19(d).  United cannot accuse TFG of a breach simply because United is not pleased with the results of that compliance.  Thus, United's first and second theories of breach are denied.

The Court will also deny United's third theory of breach.  The Lease Agreement clearly requires United to "pay to [TFG] a daily pro rata rental fee" from the time United received the Leased Equipment until the Acceptance Date.[128]  The Acceptance Date was to be "the earlier of either (i) the date as set forth in the Acceptance Certificate, or (ii) if Lessee does not, for any reason, sign an Acceptance Certificate the date shall be the date the Lessee received the equipment."[129]  Because the Final Acceptance that United signed listed the Acceptance Date as October 23, 2006, all payments prior to that date were properly classified as rental payments. Accordingly, the Court will deny the claim, but will discuss in a subsequent section United's

_____

[127]Docket No. 48, at 21.

[128]Docket No. 65 Ex. D ¶ 2(b).

[129]*Id.*

claim that TFG breached the covenant of good faith and fair dealing by classifying the payments as rental payments.

## 2. UNJUST ENRICHMENT

As a separate claim, United argues that TFG would be unjustly enriched if it was permitted to retain the $149,000 as rental payments rather than apply them to the lease payments owed.[130]  "It is settled in Utah that 'the law will not imply an equitable remedy when there is an adequate remedy at law.  Moreover, when seeking an equitable remedy, a plaintiff 'must affirmatively show a lack of an adequate remedy at law on the face of the pleading.'"[131]  Thus, even if United can show that TFG's retention of the $149,000 was improper, United has not persuasively alleged a lack of adequate legal remedy.[132]  Accordingly, the Court refuses to apply unjust enrichment.

## 3. FRAUD IN THE INDUCEMENT

United claims that TFG induced United by fraudulent misrepresentation to enter into the Lease Agreement.  This claim is based on a belief that TFG's "contemporaneous representations to Defendants that they could terminate lease [sic] and buy the equipment at the end of the 36 months were knowingly false and made for the sole purpose of inducing Defendants to enter into the lease . . . ."[133]  To prove fraudulent misrepresentation, United must show:

---

[130]Docket No. 48, at 23.

[131]*Thorpe v. Washington City*, 243 P.3d 500, 507 (Utah Ct. App. 2010) (citations omitted).

[132]*See id.*

[133]Docket No. 48, at 25.

(1) That a representation was made; (2) concerning a presently existing material fact; (3) which was false; (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that he had insufficient knowledge upon which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his injury and damage.[134]

For the Court to grant summary judgment to TFG on this claim, the Court must be persuaded that no reasonable fact finder could conclude that TFG harbored an intent not to sell the equipment to United.

The Court will grant summary judgment in favor of TFG on this claim because United has failed to show that there was a misrepresentation at all, much less an intentional one. As proof for its assertion that TFG had an intent not to sell, United refers to the Sales Agreement between TFG and Republic Bank. Shortly after entering into the Lease, TFG sold the Lease to Republic. Pursuant to the Sales Agreement, Republic bought the right to collect 43 lease payments from United.[135] Because the Base Term of the Lease was only 36 payments, United contends that the Sales Agreement shows that TFG always intended to force United into extending the Lease.

This Court dealt with this same issue in *Republic Bank v. Ethos Environmental Inc*., a case with nearly identical facts to those in the instant case.[136] In *Ethos*, Mazuma, a finance company, leased equipment to Ethos Environmental for a 24 month term.[137] The lease contained

---

[134]*Pace v. Parrish*, 247 P.2d 273, 274-5 (Utah 1952).

[135]Docket No. 89, Ex. 24.

[136]*Republic v. Ethos Envtl., Inc.,* 2011 WL 587772 (D. Utah Feb. 9, 2011).

[137]*Id.* at *1.

end of term options equivalent to those in the TFG-United Lease.[138]  Soon after the lease was signed, Mazuma sold the lease to Republic Bank, which bought the lease at a price that exceeded the value of the 24 monthly base term payments.[139]  In the context of a bad faith claim, Ethos argued that this was evidence of Mazuma's intent to force Ethos into extending the lease.[140]  The Court rejected Ethos's argument, noting that there was some value in the end of term options that added to the face value of the base term lease payments.[141]  In other words, the end of term options promised *the chance* of additional profits for Republic—either through extension of the lease, sale of the leased equipment, or a new lease for new equipment—and that the sale price merely reflected that chance.  Thus, the Court found that the "fact that Republic paid more than what Ethos may have for these options, does not per se, demonstrate bad faith."[142]

In the instant case, the price Republic paid for the Lease is merely an indication that there was some value in the Lease beyond the Base Term.  Thus, the transaction does not expose a secret intent not to sell.  If anything, it stands as an indication that Republic/TFG would likely only sell the equipment at a price that would bridge the gap between the value of the Base Term payments and the sale price that Republic paid.  Though the price may be high in United's mind, even unreasonable,[143] for purposes of United's fraud claim the price is not pertinent.  TFG may

---

[138]*Id.* at *3.

[139]*Id.* at *1.

[140]*Id.* at *5.

[141]*Id.* at *6.

[142]*Id.*

[143]United claims that TFG intentionally concealed the six extra payments sold because if United discovered that TFG would not have sold the equipment for less than the value of those

have planned all along to ask a high price for the Leased Equipment, but it never appears to have represented that it would offer a low price, or any particular price (which would provide grounds for fraudulent misrepresentation). Instead, the language of the agreement provides that the equipment can be purchased "at a price to be agreed upon" and also vests both parties with unlimited discretion in accepting or rejecting purchase terms. Thus, as long as TFG did not intend to prohibit United from purchasing the equipment at *any* price, TFG's representation that United could repurchase the equipment was not fraudulent. United has advanced no evidence showing that TFG would not have sold at any price.

These facts stand in contrast to those in *House of Flavors, INC. v. TFG Michigan, L.P.*,[144] which United relies on heavily to support its fraud claim. In *House of Flavors,* a federal district court applying Utah law found that TFG-Michigan had fraudulently induced House of Flavors, an ice cream company, to enter into a lease equivalent to the one at issue in the instant case.[145] The court's holding was based in large part on oral communications and a "side letter," which represented to House of Flavors that TFG had estimated the buyout price of the leased equipment at somewhere around 12% of the original cost.[146] When the time for purchase came, TFG

---

six payments, United would not have entered the contract. *Id.* at lxxii. While this may speak to bad faith, it does not relate to fraud, which requires a misrepresentation from a party that is intentionally false. TFG does not appear to have represented that it would sell for less than the amount of the six payments.

[144]719 F. Supp. 2d 100 (D. Me. 2010). TFG-Michigan is apparently related to the TFG of the instant case, though neither party explains how.

[145]*Id.* at 111.

[146]*Id.* at 107-08.

attempted to charge House of Flavors approximately 40% of the original cost.[147]  The lease

agreement did not specify a purchase price, and the side letter included a clause stating that the

letter was not binding.[148]  But the court found that TFG's statement that it had run an estimate

and predicted a 12% buyout was a representation of a material fact.[149]  Upon investigation, it

became clear that the TFG employee who had informed House of Flavors of the 12% estimate

had not, in reality, done any work towards a real estimate—he had simply sent House of Flavors

a copy of a letter written for another matter with the names changed.[150]  It was also clear that

TFG was trying to win House of Flavor's business over finance company competitors, and knew

that House of Flavors was comparing bids to decide which company to go with, and thus made

this false representation in the hopes of inducing reliance.[151]  Accordingly, the court found that

TFG had committed fraud.[152]

　　　United's case is quite different.  United is not alleging that TFG's actions were fraudulent

because TFG suggested it had estimated a buyout price and United relied on it to United's

detriment.  Instead, United is alleging that TFG pretended it would sell the equipment at the 36

month mark when it never intended to do so.[153]  Nothing TFG has done has indicated that it was

---

[147]*Id.* at 106.

[148]*Id.* at 104-05.

[149]*Id.* at 108.

[150]*Id.* at 108.

[151]*Id.*

[152]*Id.* at 111.

[153]Here, no evidence has been presented that TFG made any representations that a buyout cost had been estimated.  Though Mr. Tack did apparently try to negotiate for a 7% buyout price

categorically unwilling to sell at that time.  Without such evidence, United's fraud claim must fail.

4. GOOD FAITH AND FAIR DEALING

Finally, United argues that TFG breached the implied covenant of good faith and fair dealing in three ways: (1) by not informing United that its notice of election was insufficient; (2) by "attempting to impose an extension on the Master Lease when United had elected otherwise"; and (3) by classifying the original $149,000 as rental payments instead of lease payments.[154]

The implied covenant of good faith and fair dealing requires parties to "refrain from actions that will intentionally 'destroy or injure the other party's right to receive the fruits of the contract.'"[155] "To determine the legal duty a contractual party has under this covenant, a court will assess whether 'a party's actions [are] consistent with the agreed common purpose and the

_____

at the outset, Mr. Tack's own testimony confirms that TFG neither agreed to that price, nor indicated that it estimated the buyout price to be around that amount.  Mr. Tack's deposition reads as follows:

Q: [H]e never agreed to the 7 percent, right?
A: He said he would have to take it up with his superiors.
Q: The 7 percent is nowhere in 19(d)?
A: No it's not.
Q: So you didn't have an agreement on the 7 percent number?
A: No. Because he stated that the tax accountants, their auditors would not allow it because they needed it for a tax purpose . . . .
Q: The answer to my question is no, right? You did not have an agreement that there would be a 7 percent end of term purchase price; is that correct?
A: I don't remember an agreement that he said, yes, it would be, because he said he would have to take it up with other–his superiors.

[154]Docket No. 48, at 22-23.

[155]*Oakwood Vill. LLC v. Albertsons, Inc.*, 104 P.3d 1226, 1239 (Utah 2004) (quoting *St. Benedict's Dev. Co. v. St. Benedict's Hosp.,* 811 P.2d 194, 199 (Utah 1991)).

justified expectations of the other party.'"[156]  In Utah, courts determine "the 'purpose, intentions, and expectations' by considering the contract language and the course of dealings between and conduct of the parties."[157]

Here the contract imposed *no* duty on TFG to tell United that the notice provision of 19(d) had not been complied with, such that United could reasonably expect TFG to do so.[158] The covenant of good faith and fair dealing does not create "new, independent rights or duties to which the parties did not agree ex ante."[159]  The Court will not use the doctrine to foist an un-bargained-for duty of paternalism onto sophisticated contracting parties.

United's second claim, that TFG violated the covenant of good faith and fair dealing by extending the Lease, is not viable in light of the Court's finding that the extension of the Lease was proper under the Lease Agreement.  Again the Court must note that simply because a party dislikes contractual consequences does not mean the opposing party has misbehaved by enforcing them.

Finally, United alleges TFG acted in bad faith by categorizing $149,000 of payments as rental payments instead of lease payments (thereby giving United no credit for them towards the lease debt).  Specifically United claims that TFG misrepresented the requirements of the Lease in

---

[156]*Id.* 1239-40 (quoting *St. Benedict's Dev. Co.*, 811 P.2d at 200).

[157]*Id.* at 1240 (quoting *St. Benedict's Dev. Co.*, 811 P.2d at 200).

[158]*Geisdorf v. Doughty*, 972 P.2d 67, 70 (Utah 1998) ("[Lessor] had no duty to remind [Lessee] of the necessity to exercise the option by written notice.  Lessee was responsible to keep himself informed about the continuing provisions under the Lease Agreement and to protect his interests, both current and future, in the lease property.").

[159]*Id.* (quoting *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 55 (Utah 1991)).

order to induce United to sign the Final Acceptance, which in turn allowed TFG to classify the

first several months of payments from United as rental payments rather than lease payments.

At the outset, the claim seems to depend on United's ignorance of the plain terms of the

Lease. As noted above, the Lease Agreement clearly states that the Base Term does not begin

until the Acceptance Date.[160] The Acceptance Date was to be "the earlier of either (i) the date as

set forth in the Acceptance Certificate, or (ii) if Lessee does not, for any reason, sign an

Acceptance Certificate the date shall be the date the Lessee received the equipment."[161] If United

was in any doubt about whether it needed to sign the Final Acceptance to commence the Base

Term, it merely had to refer to the Lease Agreement.

Generally, "[i]gnorance of the contents of an instrument does not . . . affect the liability of

one who signs it."[162] This may not be the case, however, if the signor "is . . . misled as to its

contents."[163] Utah courts have refused to adopt a rule that allows "a person to defend against

willful, deliberate fraud by stating, 'You should not have trusted or believed me' or 'Had you not

been so gullible you would not have been [so] deceived.'"[164] "A man may perhaps be able to

discover for himself what he ought to know if left to his own devices, but where he is induced by

---

[160]Docket No. 65 Ex. B ¶ 2(a).

[161]*Id.*

[162]*Garff Realty Co. v. Better Bldgs.*, 234 P.2d 842, 844 (Utah 1951) (quoting 12 Am. Jur. *Contracts* § 137).

[163]*Id.*

[164]*Berkeley Bank for Coops. v. Meibos*, 607 P.2d 798, 805 (Utah 1980) (quoting *Johnson v. Allen*, 108 P.2d 134, 137 (Utah 1945)).

the artifice of another not to use his opportunities it would seem hardly fair that the one using the trick or misrepresentation should remain protected."[165]

United claims that it was told by TFG that "the base term would not commence until [United] signed [the Final Acceptance Certificate]," and that when TFG provided this information "it knowingly omitted and concealed . . . the fact that if Mr. Tack did not sign the Final Acceptance Certificate, the Acceptance date would be deemed under the lease agreement to be the date United received the leased equipment."[166] TFG apparently does not dispute that it represented that United had to sign a Final Acceptance in order to commence the Base Term, but it denies that this was a misrepresentation. TFG argues that United's execution of the Partial Acceptance rendered void the provision date allowing the Acceptance Date to relate back to the Delivery Date. Indeed, the provision is constructed in the disjunctive—the date is either the Delivery Date or the date an acceptance certificate is signed. TFG contends that "[a]t that time, Section 2(a) of the Lease Agreement was no longer applicable because United had already executed 'an Acceptance Certificate,' as defined by Section 2(a) of the Lease Agreement."[167]

However, TFG's interpretation of the contract is not consistent with the language of the Partial Acceptance itself. That document makes explicit that it "does not constitute an Acceptance Certificate as defined in the Lease."[168] It follows that the signing of the Partial Acceptance did not, in fact, void the provision allowing the Acceptance Date to relate back to the

---

[165]*Allen*, 108 P.2d at 154.

[166]Docket No. 89, at lxxii.

[167]Docket No. 107, at 21.

[168]Docket No. 65 Ex. G, at 1.

delivery date. As such, TFG's representation that United had to sign a Final Acceptance to commence the Base Term was a false representation. No facts are presented as to whether the falsity was knowing or reckless. Furthermore, "[t]he issue of actual reliance and the reasonableness of the reliance is, of course, for the [finder of fact] to determine. It is also for the [finder of fact] to determine whether the representations were of such a character and made under circumstances that they were likely to deceive."[169] Accordingly, summary judgment is denied as to this claim.[170]

## IV. UNITED'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT

United has submitted two motions for summary judgment. The first asks the Court to determine that the Lease between TFG and United is actually a security agreement. The second asks the Court to grant judgment in favor of the guarantors on TFG's breach of contract claim against them.

### A.     LEASE OR SECURITY INTEREST

Utah Code Ann. § 70A-1a-203 sets forth guidelines for distinguishing between a lease and a security interest. The statute provides that if the lease is not voidable by the lessee and one of four conditions is satisfied, a transaction that purports to be a lease is actually a security

---

[169]*Berkeley*, 607 P.2d at 801 (citations omitted).

[170]TFG would have the Court bar United's claim by application of the economic loss doctrine. The doctrine requires that "[a]ll contract duties, and all breaches of those duties— no matter how intentional—must be enforced pursuant to contract law." *Digecor, Inc. v. E. Digital Corp.*, 2007 WL 185477, at *5 (D. Utah 2007) (internal quotation marks omitted). It is unclear why TFG thinks United is pursuing its fraud claim under tort as opposed to contract law. It is certainly not the case that United is simply forbidden to pursue fraud claims against TFG because there is a contract. Regardless, to the extent that United is pursuing fraud damages under the contract, as opposed to in a separate tort law action, the economic loss doctrine does not bar United's claims.

agreement.[171]  The parties only address the first condition: "the original term of the lease is equal to or greater than the remaining economic life of the goods."[172]  In other words, the items purportedly leased will have no economic value at the time the lease concludes.  It is undisputed that United was not permitted to cancel the Lease at any time.  United contends, via expert testimony, that the economic life of the goods was exhausted during the lease period.  Adding these two propositions together, United reasons that this Court must conclude that TFG and United entered into a security agreement rather than a lease.  TFG disagrees that the term of the Lease was equal to or greater than the remaining economic life of the software and equipment.  TFG also attacks the qualifications of United's expert.

The relevant time for determining whether an agreement is a lease or a security agreement is at the time the agreement is made.[173]  The focus must be on whether, at the time the agreement was made, the software and equipment could be said to have had any economic life at the conclusion of the lease period.  The standard is not subjective, however.  The question of whether there is value left in the leased goods is one of "economics, not the intent of the parties."[174]

"Remaining economic life" is not defined in the code.  Nor is it clear whether the relevant point of view is the lessor or the lessee's.  There seems to be no Utah case law directly on point,

---

[171]Utah Code Ann. § 70A-1a-203.

[172]*Id.* § 70A-1a-203(2)(a).

[173]*Id.* § 70A-1a-203(5) ("The 'remaining economic life of the goods' . . . must be determined with reference to the facts and circumstances at the time the transaction is entered into.").

[174]U.C.C. § 1-203 Lease Distinguished from Security Interest, Official Comment 2.

and the official comments to the UCC section upon which Utah's section is modeled sheds little

light.  Several cases from other states and bankruptcy courts have adopted the position that the

focus should be on residual value from the lessor's point of view: "If the lessor retains a

meaningful residual interest in the leased property at the end of the lease term, the lease is a true

lease.  If, however, the lessor cannot reasonably expect to receive anything of value at the end of

the lease, then the lease creates a security interest."[175]  Commentators agree:

> The central feature of a true lease is the reservation of an economically
> meaningful interest to the lessor at the end of the lease term. Ordinarily this means
> two things: (1) at the outset of the lease the parties expect the goods to retain some
> significant residual value at the end of the lease term; and (2) the lessor retains
> some entrepreneurial stake (either the possibility of gain or the risk of loss) in the
> value of the goods at the end of the lease term.[176]

If economic life or value to the lessor is the proper focus, then the Court must determine whether

TFG could be said to have retained any valuable residual interest in the Leased Equipment at the

time TFG leased the equipment to United.

In arguing that the Leased Equipment had no remaining economic life after the Base

Term, United relies on a report prepared by Derk Rasmussen, a forensic accountant.  Two of Mr.

Rasmussen's observations, provided in a report to United in which he answered several specific

questions about the Lease, indicate that a reasonable fact-finder could find that TFG retained a

---

[175]*Addison v. Burnett*, 41 Cal. 4th 1288, 1296 (Cal. Ct. App. 1996) (quoting *Kimco Leasing, Inc. v. State Bd. of Tax Comm'rs*, 656 N.E.2d 1208, 1218 (Ind. T.C. 1995)); *accord B&S Mktg. Enters, LLC v. Consumer Prot. Div.*, 835 A.2d 215, 234 (Md. Ct. Spec. App. 2003) ("The central feature of a true lease is the reservation of an economically meaningful interest to the lessor at the end of the lease term.") (quoting Edwin E. Huddleson, *Old Wine in New Bottles: UCC Article 2A Leases*, 39 Ala. L. Rev. 615, 625 (1988)); *In re Warne*, 2011 WL 1303425, at *3 (Bankr. D. Kan. 2011) (quoting Huddleson); *In re WorldCom*, 339 B.R. 56, 71 (Bankr. S.D.N.Y. 2006) (same).

[176]4 White & Summers UCC § 30-3 (6th ed.) (quoting Huddleson, *supra* note 175, at 625).

valuable residual interest in the Leased Equipment that extended beyond the life of the Lease. First, Mr. Rasmussen notes that "while used computer equipment may have little value on the open market, it could have value in use because if the equipment is functioning properly, it may be more cost effective to use existing equipment than to incur costs to replace such equipment."[177]  It follows that at the close of a lease of computer equipment, though the equipment may not have transferrable value, it can still be valuable to the lessee.  It also follows that this value to the lessee can be extracted by the lessor, who has retained a possessory interest in the leased property.  Mr. Rasmussen refers to this value as "leverage."  He calculates that the cost to United of replacing the software and equipment at the end of the Lease would have been around $22,000.[178]  It follows that by retaining title to the software at the outset, TFG would have leverage to extract more value out of it, up to the amount it would cost United to replace the software.  Mr. Rasmussen claims that "in this particular case . . . [it] is not necessarily true" that there was economic value left in the software because "[t]here is evidence in the record that suggests implementation of the leased accounting system was a failure, and that the vast majority of the property, including the software implementation and costs incurred, were [sic] never used by United Services."[179]  This observation focuses on the wrong point in time.  Whatever occurred after the Lease was signed is irrelevant to determining whether the economic life of the equipment, at the time the Lease was made, was less than or equal to the term of the Lease.  Here

---

[177]Docket No. 80 Ex. 5, at 10.

[178]*Id.* at 15.

[179]*Id.* at 11.

it appears that at the time the Lease was made, TFG retained some leverage value beyond the term of the Lease by retaining title to the software.

Second, Mr. Rasmussen addressed head-on whether the remaining economic life of the equipment exceeded 36 months at the time of the transaction:

> If the software had been used as planned, it would have some remaining economic life as of the date of the transfer. However, it is likely that any remaining economic useful life would have been limited because the services and purchase price paid for the software initially included just one year of software upgrades.[180]

In other words, working accounting software in the box has an economic life that exceeds 36 months—a value only lost in this case due to subsequent implementation problems. The issue is further complicated, however, by the fact that United did not, at the outset, purchase software upgrades that would periodically update the software over the course of the Lease. Thus, Mr. Rasmussen suggests, even if there was value past the 36 months at the time of the transaction, it would be "limited." Limited is not the same as non-existent. The subsection of the statute upon which United focuses requires that the term of the lease swallow the entire value of the product. Given this, even if Mr. Rasmussen's testimony were undisputed, a reasonable fact finder could still find that the Leased Equipment had value beyond the term of the Lease.[181] Accordingly, the

---

[180]*Id.* at 22.

[181]This is not contradictory to the Court's earlier holding that the abandonment of the software caused no damage to TFG. Damages are determined from the perspective of the plaintiff—the relevant inquiry is whether the plaintiff can show any damage proximately caused by the conduct of the defendant. In contrast, the lease versus security interest inquiry is objective, focusing on whether, as a matter of economics, leased equipment will retain any value at the end of the lease period, determined at the time the lease was entered into. Here the Lease had value beyond the 36 month Base Term because, when implemented, it would have value to United that TFG could extract by sale at the end of the term. As it happened, United was not able to use the equipment successfully, so there was no chance that United would buy the software at the end of the extension period. Though title to the software might have been

Court cannot find as a matter of law that the agreement between TFG and United was a security agreement and Defendants' Motion will be denied.

TFG has also requested that Mr. Rasmussen's testimony be ignored by this Court because he is not qualified as an expert in this area.[182] In light of the discussion above, this request is moot.

B.    THE GUARANTIES

Both parties have moved for summary judgment on TFG's breach of contract claim against the guarantors. The guarantor's obligations are established in three separate documents: The Guaranty Agreement, the Amended and Restated Lease Schedule No. 1 (the "Amended Lease Schedule") to Master Lease Agreement, and the Master Lease Agreement.

The Guaranty Agreement requires Stein-Sterling and Simon to guarantee "the full, complete and prompt payment, performance and observance of all of Lessee's obligations under each Lease, including without limitation the payment of rents and the payment of all amounts required or provided for under the Lease resulting from Lessee's breach or non-performance thereof."[183] The agreement further provides that "[n]othing shall discharge or satisfy guarantor's obligations hereunder except the full payment, performance and observance of all of Lessee's obligations under each lease."[184] This provision is modified by the Amended Lease Schedule. That document states that "provided no material Event of Default has occurred or is continuing

_____

valuable such that TFG would be damaged by its loss, United's abandonment of the software did not proximately cause the loss of that value to TFG.

[182]Docket No. 80, at 10.

[183]Docket No. 73 Exs. C & D ¶ 1.

[184]*Id.* ¶ 6.

48

(or has not been cured within 15 days after written notice is provided to Lessee), the Guaranties shall be released upon completion of the eighteenth (18th) month of the Base Lease Term."[185] The Amended Lease Schedule incorporates by reference the terms of the Master Lease Agreement. The Master Lease Agreement identifies several events of default, one of which is "Lessee abandons any item of Equipment."[186]

The Court has found that United abandoned the equipment after reaching a settlement agreement with the software company and the implementation consultants on September 24, 2007.[187] September 24, 2007, is well within the 18 month period, which began October, 2006, when the Final Acceptance was signed. Because abandonment of the equipment was a specifically identified "event of default," the guarantors were not released at the eighteenth month, and they are still guarantors of all United's obligations under the Lease.

United contends that because the time of guaranty was limited to the first eighteen months of the Lease the guarantor's liability for breaches should likewise be limited. The Court disagrees with this interpretation. The Amended Lease Schedule only releases the guarantors at eighteen months "[p]rovided no material Event of Default has occurred or is continuing."[188] If such an event has occurred or is occurring, the guarantors are not released, and the guaranty agreement continues to govern, which requires the guarantors to be liable for all of United's obligations. Nothing in any of the documents touching on the guarantor arrangement indicates

---

[185]Docket No. 73 Ex. E ¶ 10.

[186]Docket No. 65 Ex. D ¶ 15(a)(3).

[187]Docket No. 66 Ex. Y.

[188]Docket No. 73 Ex. E ¶ 10.

that if an event of default has occurred, the guarantors remain on the hook but only for damages incurred during the first eighteen months. The Court will not invent such a provision on its own. Accordingly, TFG's Motion for summary judgment on the guarantors will be granted and United's Motion will be denied.[189]

## IV. MISCELLANEOUS MOTIONS

### A. MOTION TO STRIKE FOOTNOTE 5

TFG has submitted a motion asking the Court to strike footnote five from United's Memorandum in Support of Motion to Dismiss.[190] The footnote in question accuses TFG of having a history of inventing phone calls. The Court will deny the Motion as moot because the offending footnote need not be considered in order for the Court to arrive at a decision on the Motion to Dismiss.

### B. MOTION TO EXCLUDE OPINION OF DERK RASMUSSEN

TFG has submitted another motion asking the Court to exclude the testimony of Derk Rasmussen, an expert relied upon by United in support of its argument that the Lease was

---

[189]United's failure to notify TFG of issues with the software is not properly classified as an event of default under the Master Lease Agreement. Only one of the specifically defined events of default in the Lease Agreement might apply to United's failure to notify: "An 'Event of Default' shall occur under any lease if . . . Lessee or any guarantor of Lessee, fails to observe or perform any of its covenants and obligations required to be observed or performed under the Lease and *such failure continues uncured for ten (10) days after written notice is provided to Lessee.*" Docket No. 65 Ex. D ¶ 15(a)(4) (emphasis added). This provision, applied to United's failure to notify, creates curious results. The "failure to perform" on United's part would be its failure to notify TFG of software issues (not the occurrence of the software issues themselves). Before that failure to notify became an event of default, however, TFG would have to have provided notice to United that United had failed to provide TFG with notice of the problems (at which point, of course, such notice would be superfluous), and United would have to had continued to not notify TFG for ten days. Clearly this did not occur (and the absurdity that would arise if it did occur probably speaks to the provision's inapplicability to United's duty to notify).

[190]Docket No. 120.

actually a security agreement.[191]  To the extent that TFG is asking the Court to ignore Mr.

Rasmussen's testimony on that issue, the request is moot, and the Motion will be denied.  Mr.

Rasmussen's testimony aids TFG's arguments—it does not hinder them.  If TFG desires to have

Mr. Rasmussen's testimony excluded from trial the Court instructs TFG to deal with the matter

in a Daubert motion prior to trial.

C.      MOTION TO STRIKE MOTION ON THE NATURE OF THE AGREEMENT

        TFG asks the Court to strike United's Motion for Patrial Summary Judgment on the

Nature of the Parties' Agreement, or, in the alternative, to allow United more time for discovery

on the issue.  Because the Court has found against United on this issue, the Court will deny

TFG's Motion as moot.

## V. CONCLUSION

        Based on the foregoing, it is hereby

        ORDERED that Defendants' Motion to Dismiss for Lack of Subject-Matter Jurisdiction

Pursuant to Rule 12(b)(1) (Docket No. 67) is DENIED. It is further

        ORDERED that Plaintiff's Motion for Summary Judgment on all Claims (Docket No. 64)

is GRANTED IN PART and DENIED IN PART as set forth in this Order.  It is further

        ORDERED that Defendants' Motions for Partial Summary Judgment on the Nature of the

Lease Agreement (Docket No. 70) and on the Issue of the Guaranties (Docket No. 72) are

DENIED.  It is further

        ORDERED that Plaintiff's Motion to Exclude Opinion of Derk Rasmussen (Docket No.

82) is DENIED as moot.  It is further

---

[191]Docket No. 82.

ORDERED that Plaintiff's Motions to Strike Footnote No. 5 to Defendants' Reply in Support of their Motion to Dismiss (Docket No. 120) is DENIED. It is further

ORDERED that Plaintiff's Motion to Strike Defendant's Motion for Partial Summary Judgment on the Nature of the Parties' Agreement and in the alternative Plaintiff's Motion for Additional Discovery (Docket No. 86) is DENIED. Consistent with this Court's practice, this matter will be referred to Magistrate Judge Warner for a settlement conference, which is set for November 18th, 2011 at 9:00 am.

DATED   November 1, 2011.


BY THE COURT:

_____
TED STEWART
United States District Judge